**EOD**
01/10/2013

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TEXARKANA DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **MICHAEL G. RUTH** | § | Case No. 10-50184 |
| xxx-xx-3580 | § | |
| **ELNORIA J. RUTH** | § | |
| xxx-xx-0832 | § | |
| | § | |
| Debtors | § | Chapter 13 |

| | | |
|---|---|---|
| ALLEGRA NETWORK, LLC | § | |
| | § | |
| Plaintiff | §. | |
| | §. | |
| v. | § | Adversary No. 10-5009 |
| | § | |
| MICHAEL G. RUTH and | § | |
| ELNORIA J. RUTH | § | |
| | § | |
| Defendants | § | |

## <u>MEMORANDUM OF DECISION</u>

This matter came before the Court for trial of the complaint asserted by the

Plaintiff, Allegra Network, LLC (the "Plaintiff"), which seeks a determination of whether

a debt allegedly owed to them by the Debtor-Defendants, Michael G. Ruth and Elnoria J.

Ruth (the "Debtors") is excepted from discharge pursuant to 11 U.S.C. §523(a)(6).  The

complaint further seeks a declaration, pursuant to 28 U.S.C. §2201, that the Plaintiff's

right to equitable relief to enforce a covenant not-to-compete signed by the Debtor-

Defendants is "not a claim subject to discharge in bankruptcy."[1]   After the submission of

---

[1]  The Plaintiff's complaint also originally sought the actual imposition of a permanent injunction to enforce the Plaintiff's rights under the covenant not-to-compete.  However, such request for injunctive relief was abandoned by the Plaintiff at trial.

post-trial briefing by the parties, the Court took the matter under advisement.  The

following memorandum of decision disposes of all issues pending before the Court to the

extent that such issues may be properly addressed at the present time.[2]

Prior to addressing the issues regarding the dischargeability of the alleged debt

pursuant to §523(a)(6), the Court must make two predicate determinations regarding the

declaratory relief sought by the Plaintiff, Allegra.  First, the Court must determine

whether the covenant not-to-compete in the original Franchise Agreement is enforceable

at all against the Debtor-Defendants.  If it is enforceable, the Court must then determine

whether the enforcement of the covenant not-to-compete under the controlling law

constitutes a "claim" held by the Plaintiff, as contemplated by § 101(5)(b) of the

Bankruptcy Code, that would be subject to the scope of any discharge ultimately entered

in favor of the Debtor-Defendants in their Chapter 13 bankruptcy case.  Only with an

enforceable covenant that does not constitute a claim under §101(5) would the Plaintiff be

entitled to pursue the imposition of any equitable remedies against the Debtor-

Defendants.

---

[2]  This Court has authority to enter a final judgment in this adversary proceeding since it
statutorily constitutes a core proceeding as contemplated by 28 U.S.C. §157(b)(2)(I) and (O) and meets
all constitutional standards for the proper exercise of full judicial power by this Court.  The Court
entertains the Plaintiff's request for a declaratory judgment pursuant to 28 U.S.C. § 2201.

## Factual and Procedural Background

On October 23, 1984, the Debtor-Defendants, Michael G. Ruth and Elnoria J. Ruth, executed a Franchise Agreement with Insty-Prints, Inc., a Minnesota corporation, under which the Debtors, as owner-operators, would operate an Insty-Print commercial printing shop in Texarkana, Texas.[3]  The original term in that 1984 Franchise Agreement was 10 years.[4]  Six months before the expiration of that initial ten-year period, Insty-Prints, as the franchisor, was obligated to offer the Debtors, as franchisees, an offer to extend the relationship unless, with at least seven months' notice, either party notified the other of its intent not to continue the franchise relationship.[5]  The Franchise Agreement also contained a covenant stating that, should it expire or terminate for any reason, the Debtors would not compete with the Franchisor or any other Franchisee of the Franchisor for a period of one year from the date of termination or expiration in the same business or one similar thereto.[6]  The Debtors executed this agreement and have not contested its validity generally.  Seven years later, in 1991, the Debtors purchased a building located at 3101 New Boston Road in Texarkana from which they would thereafter continually operate their Insty-Prints franchise.  The business whose activities are at issue here

---

[3] Ex. P-2.

[4] Ex. P-2 at 3, ¶ 3.

[5] Ex. P-2 at 3, ¶ 4.

[6] Ex. P-2 at 9, Article XVII ¶ 2.

remains in that location.

The franchise relationship progressed to the point that Insty-Prints and the Debtors executed, in October 1995,[7] an "Addendum to Insty-Prints, Inc. Franchise Agreement" (the "1995 Renewal Addendum").[8]  That addendum extended the provisions of the 1984 Franchise Agreement for another ten-year period.[9]  The 1995 Renewal Addendum also slightly altered the franchisees' royalty obligations[10] and enlarged the geographic area in which the Debtors contained an exclusive right of first refusal to operate Insty-Prints franchises.[11]

In the midst of the second term, Insty-Prints, the original franchisor, assigned all of its rights under the Franchise Agreement and any addenda thereto to the current Plaintiff, Allegra Network, LLC, as part of a larger transfer of assets.  When the second 10-year term neared a close in 2005, Allegra sent the Debtors a proposed "Renewal Addendum to Franchise Agreement."[12]  After negotiations regarding unpaid royalties and other outstanding issues between the two sides, they subsequently executed a "Renewal

---

[7]  The Debtors continued to operate the business under the 1984 Franchise Agreement during the 12-month gap period as they negotiated with Insty-Prints regarding the extension of the agreement.

[8] Ex. P-4.

[9] Ex. P-4 at 1.

[10] *Id.*

[11] *See* Letter attached to 1995 Renewal Addendum in Ex. P-4.

[12] Ex. P-6.   This proposal was not actually executed, but served as the foundation for the extension ultimately reached.

Addendum to Franchise Agreement" in February 2006 ("the 2006 Renewal Addendum).[13] The 2006 Renewal Addendum again extended the primary term of the original agreement for another ten years to October 23, 2015.[14] Just as the 1995 Addendum before it, the 2006 Renewal Addendum specifically kept the 1984 Franchise Agreement in effect pursuant to ¶ 5, which outlined the rights and responsibilities of both parties dating back to the original 1984 Franchise Agreement.[15] Significantly, the 2006 Renewal Addendum also contained an entirely new provision requiring that all matters germane to the Franchise Agreement and/or the dealings between the parties be governed by the laws of the State of Michigan.[16]

Eventually, due to the subsequent failure of the Debtors to pay the required past-due royalty amounts, as well as ongoing royalty fees as they accrued, Allegra sent the Debtors a notice of intention to terminate the Franchise Agreement on September 17, 2008.[17] The Notice of Termination specifically referenced the "Franchise and License Agreement dated October 23, 1984 and renewed on February 16, 2006."[18] Allegra

---

[13] Ex. P-7.

[14] *Id.* at ¶ 2. In order to bring obligations up to date, the addendum also required the Debtors to execute a promissory note in favor of Allegra for the payment of accrued and unpaid royalties in the amount of $97,817.52. See Ex. P-8.

[15] *Id*. at ¶ 5.

[16] *Id*. at ¶ 6.

[17] Ex. P-9.

[18] *Id*.

officially terminated the franchise relationship by notice sent on November 6, 2008.[19]

Prior to the filing of the Debtors' voluntary bankruptcy petition, Allegra brought suit in 2010 against the Debtors before the United States District Court for the Eastern District of Michigan. The complaint in that diversity suit alleged a breach by the Debtors of both the Franchise Agreement and the covenant not-to-compete that became operative after Allegra's 2008 termination of the Franchise Agreement. For the breach claim, Allegra sought monetary damages including payments due under the 2006 promissory note and royalties arising after that point. Allegra further sought the issuance of a permanent injunction in enforcement of the covenant not-to-compete in the original Franchise Agreement and to preclude the Debtors from continuing any competing operations for the proscribed period. The prosecution of that federal lawsuit was stayed by the filing of the Debtors' voluntary petition for relief under Chapter 13 of the Bankruptcy Code on August 13, 2010 in the Texarkana Division of this Court. On December 3, 2010, the Plaintiff filed the Complaint that gives rise to the present dispute.

---

[19] Ex. P-10.

## Discussion

*The Covenant Not To Compete*

The key issue before the Court concerns the enforceability of the covenant not-to-compete as contained in the original 1984 Franchise Agreement. If, as Plaintiff alleges, the covenant is enforceable against the Debtors, the Court must then determine whether the equitable remedies otherwise available to enforce that covenant are subsumed into a "claim" that is subject to discharge in the Debtors' bankruptcy case.

Interestingly, any controversy regarding the covenant arises solely because of the choice-of-law provision that was inserted at the Plaintiff's insistence into the 2006 Renewal Addendum. Absent that provision, there would be no non-bankruptcy barrier to the enforcement of the covenant because both Texas (home to the Debtors and the franchise itself) and Minnesota (the principal place of business of Allegra's predecessor-in-interest) generally allowed the enforcement of reasonable covenants not-to-compete in 1984, when the parties signed the original Franchise Agreement. *See Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 770 (Tex. 2011) (*citing Patterson v. Crabb*, 51 S.W. 870 (Tex. Civ. App. 1899)) [Texas public policy favors enforcing non-competition agreements so long as they are "reasonable"]; *Medtronic, Inc. v. Advanced Bionics Corp.*, 630 N.W.2d 438, 440 (Minn. Ct. App. 2001) (*citing National Recruiters, Inc. v. Cashman*, 323 N.W.2d 736, 740 (Minn. 1982)) [Minnesota "disfavors" non-compete agreements but

enforces them under close scrutiny].  Until 1985, however, the State of Michigan considered covenants not-to-compete absolutely void as a matter of public policy.[20]  The Plaintiff's insistence upon the application of Michigan law to interpret the viability of this and other covenants contained within the Franchise Agreement thus places the enforcement of this covenant at risk.

To decide this question, the Court is required to examine the character of the subsequent addenda to the 1984 Franchise Agreement to determine whether they constitute revised extensions of one continuous agreement beginning in 1984 and ending with its termination in 2008 or whether each addendum stands as a separate, individual contract in their own right.  The former characterization renders the covenant unenforceable pursuant to Michigan law, which precludes enforcement of pre-1985 covenants not-to-compete, even after statutory changes were enacted in 1985 that changed Michigan public policy by authorizing the validity of such covenants.  In other

---

[20] Former MICH. COMP. LAWS ANN. § 445.761 (West 1985), effective June 20, 1905, and in effect when the covenant not to compete in the instant case was created in October 1984, provided:

> Sec. 1. All agreements and contracts by which any person, co-partnership or corporation promises or agrees not to engage in any avocation, employment, pursuit, trade, profession or business, whether reasonable or unreasonable, partial or general, limited or unlimited, are hereby declared to be against public policy and illegal and void.

See also Compton v. Joseph Lepak, D.D.S., P.C., 397 N.W.2d 311, 313-14 (Mich. Ct. App. 1986) [discussing the enforceability of covenants not to compete after the repeal of § 445.761 in 1985]. The Michigan statute outlawing both reasonable and unreasonable covenants not to compete had only one exception (inapplicable to this case) that was codified at MICH. COMP. LAWS ANN. § 445.766.  That exception dealt specifically with covenants accompanying the transfer or sale of businesses, trade pursuits, avocations, or professions.

words, a covenant not-to-compete that was rendered void under the former Michigan

statute "did not become valid and enforceable upon repeal of the statute." *Lansing-Lewis*

*Serv's, Inc. v. Schmitt*, 470 N.W.2d 405, 408 (Mich. Ct. App. 1990) (*citing Product*

*Finishing Corp v. Shields*, 405 N.W.2d 171 (1987), lv. den. 430 Mich. 859 (1988), cert.

den. 488 U.S. 955 (1988)); *Compton v. Joseph Lepak, D.D.S., P.C.*, 397 N.W.2d 311, 316

(Mich. Ct. App. 1986) ["[R]epeal of [§445.761 invalidating covenants not to compete]

does not make the agreement valid because the Legislature cannot validate a contract

which never had a legal existence."]; *Park-Ohio Indus., Inc. v. Carter*, 2007 WL 470405,

at *5 (E.D. Mich. 2007).[21]   The latter interpretation achieves the opposite result since

there is no argument that the State of Michigan authorized the recognition and

enforcement of such covenants at the time the 2006 Renewal Addendum took effect.  *See*

Mich. Comp. Laws Ann. § 445.774a (West 2012).

Though in some areas of Michigan contract law, the question of "extension" (a

continuous contract) versus "renewal" (a new, distinct agreement) is settled by the

presence of a default rule,[22] Michigan franchise law has no such default rule, and the

statute controlling nearly all aspects of franchise relationships under Michigan law, the

---

[21]   The Michigan law allowing such covenants also explicitly limits its application to those entered into after March 29, 1985. Mich. Comp. Laws Ann. § 445.774a (4a)(2) (West 1987).

[22]   For example, Michigan insurance law construes each subsequent insurance policy as a new, distinct contract.  *Brady v. Northwestern Ins. Co.*, 11 Mich. 425, 1863 WL 1194 at *4 (Mich. 1863). Each renewal policy must be the result of an offer and acceptance, based on mutual consideration, and governed in the absence of new terms by the provisions of the policy as originally issued.  *Farmers Ins. Exchange v. Allstate Ins. Co.*, 143 F. Supp. 213, 216 (E.D. Mich. 1956).

Franchise Investment Law,[23] offers no guidance on the point.  Therefore, whether each renewal addenda formed the basis for a new, distinct contractual arrangement or merely constituted an extension of one continuous contractual relationship in effect since 1984 requires an analysis of the entire contractual relationship in order to ascertain the intent of the parties.  *See DRG, Inc. v. Talent Tree, Inc.*, 119 Fed. Appx. 702, 706-707 (6th Cir. 2004) [construing Michigan law to determine whether parties created new agreements following sale of franchise or extended existing contract].  Where, as here, several agreements relate to the same subject matter, the intention of the parties must be gleaned from all the agreements.  *Omnicom of Michigan v. Giannetti Inv. Co.*, 561 N.W.2d 138, 140 (Mich. Ct. App. 1997); *Culver v. Castro*, 338 N.W.2d 232 (Mich. Ct. App. 1983).  If a subsequent agreement *completely* covers the subject matter and contains terms that are inconsistent with the prior agreement, and that later alteration cannot be legitimately reconciled with the former, "the later document supersedes and rescinds the earlier agreement"  *Culver*, 338 N.W.2d at 234 (*quoting Joseph v. Rottschafer*, 227 N.W. 784 (Mich. 1929)) (internal quotations omitted).

In this case, after a specified original term period of ten (10) years, the agreement understandably requires that the parties agree to continue the franchise relationship.[24] Clearly, either party possessed the option of allowing the relationship to cease naturally,

---

[23]  MICH. COMP. LAWS ANN. §§ 445.1501-1546 (2012).

[24]  Ex. P-2 at 3, ¶ 4.

and neither party could be bound to an extension without its consent.  As to that process,

the original Franchise Agreement stated, in relevant part:

> Six (6) months prior to the expiration date of this ten (10) year Agreement the Franchisor *shall offer the Franchisee a new franchise agreement*, unless not less than seven (7) months prior to the expiration of this agreement either party gives notice by certified mail to the other party of its intention not to continue the franchisor-franchisee relationship at the expiration of the original ten (10) year term hereof.[25]

Though this language arguably contemplates the promulgation of a new franchise

agreement at the end of each term, it does not actually preclude the extension of the

original agreement into a succeeding term of years.

Indeed, the language utilized in both the 1995 and the 2006 renewal addenda

specifically indicates that an extension of the 1984 Franchise Agreement was, in fact,

what the parties elected to do.  The 1995 Renewal Addendum was executed by the parties

to "amend and revise certain provisions of the Franchise Agreement between the

Franchisee and the Franchisor dated October 23, 1984,"[26] and included an extension of

the initial term and certain other additions.[27]  The 2006 Renewal Addendum,[28] the first

real chance that Allegra enjoyed to alter its contractual relationship with the Debtors, also

---

[25] *Id*. (emphasis added).

[26] *See* Ex. P-3 at 1 (emphasis in original).

[27] The 1995 Renewal Addendum, for example, revised the formula by which royalties would be assessed against the Debtor-Franchisees.  *See* Ex. P-3 at 1.

[28] *See* Ex. P-4 at 1.

followed a similar format.[29]  In both instances, the parties extended the term of their

contractual relationship by electing to supplement, rather than supplant, the terms of the

original Franchise Agreement.  In each instance, the term "Franchise Agreement" was

specifically defined as the document signed October 23, 1984 and that Agreement was

referenced repeatedly as part of the operative contract.  The 2006 Renewal Addendum

specifically stated that its additional terms "shall be deemed a part of and is hereby

incorporated into the [1984] Franchise Agreement and all terms and conditions not

expressly modified by this Renewal Addendum shall remain in full force and effect as

written."[30]  This language evidences a clear intent by the parties to construct one

continuous contract, extended and supplemented as needed through the life of the

franchise relationship, and not the creation of distinct, separate contracts to be given

independent legal significance.  Accordingly, the 1995 and 2006 renewal addenda each

constituted an extension of the original 1984 Franchise Agreement and the covenant not-

to-compete that was unenforceable pursuant to Michigan law at its inception in 1984

remains unenforceable to this date.  *Schmitt*, 470 N.W.2d at 408; *Compton*, 397 N.W.2d

at 316.

---

[29]  The 2006 Renewal Addendum supplemented the agreement by and among the parties by
adding both the choice-of-law provision, Ex. P-4 at 3, ¶ 6, and a provision granting the Debtor-
Franchisees a unilateral option for further extension provided they met certain enumerated conditions.
Ex. P-4 at 2, ¶ 2 (a)-(e).

[30] *Id*. at 3, ¶ 8.

*Plaintiff's Equitable Remedies as a Claim in Bankruptcy*

Having determined that the covenant not-to-compete is unenforceable against the Debtors by operation of Michigan law, it may not be mandatory for the Court to address the secondary, dependent issue relating to the effect of any subsequent discharge order upon the Plaintiff's alleged equitable remedies.  However, even if the terms of the covenant not-to-compete were otherwise enforceable against the Debtors under Michigan law, and equitable remedies thus remained generally available to the Plaintiff, such remedies still fall within the definition of a bankruptcy "claim" and are still subject to the protections of any eventual Chapter 13 discharge injunction that might be issued in the Debtors' bankruptcy case.

For the purposes of the Chapter 13 discharge injunction, the definition of a "claim" as set forth in § 101(5) of the Bankruptcy Code determines what is or is not affected by the entry of such an order.  That definition states, in pertinent part:

> (5) The term "claim" means--
>
> ...
>
> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(5).

According to the United States Supreme Court, the term "claim" as defined in the

Bankruptcy Code is construed broadly to permit a debtor to funnel virtually all of its

existing obligations into a bankruptcy case and to enable holders of claims to participate

thereafter in the bankruptcy proceedings.  As the Supreme Court has stated, that broad

definition of a claim, currently codified under §101(5):

> ...is intended to cause the liquidation or estimation of contingent rights of
> payment for which there may be an alternative equitable remedy with the
> result that the equitable remedy will be susceptible to being discharged in
> bankruptcy.  For example, in some States, a judgment for specific
> performance may be satisfied by an alternative right to payment in the event
> performance is refused; in that event, the creditor entitled to specific
> performance would have a 'claim' for purposes of a proceeding under title
> 11.

*Ohio v. Kovacs*, 469 U.S. 274, 279 (1985).  Its purpose is to permit "the broadest possible

relief in the bankruptcy court."  S. Rep. No. 95-989, at 22 (1978).

Thus, when evaluating whether a party's equitable remedy is incorporated into the

concept of a "claim" and is therefore subject to discharge, the Fifth Circuit has

determined that a court should analyze "whether the applicable law viewed the payment

of money as an available alternative."  *Vega v. Rexene Corp.*, 59 F.3d 1242, 1995 WL

413074, at *4 (5th Cir. 1995), citing *Sheerin v. Davis (In re Davis)*, 3 F.3d 113, 116–17

(5th Cir.1993);[31] *see also In re Ben Franklin Hotel Assocs.*, 186 F.3d 301, 305 (3d Cir.

1999) [finding that "an equitable remedy will give rise to a right of payment, and

---

[31]  In *Sheerin*, the Circuit, applying Texas law, concluded that the payment of money was not an
alternative to the maintenance of an equitable owner's interest in real property through recognition of a
resulting trust.

therefore be deemed a 'claim,' when the payment of monetary damages is an alternative to the equitable remedy"]; and *Kennedy v. Medicap Pharmacies, Inc.*, 267 F.3d 493, 497 (6th Cir. 2001) ["[t]he right to equitable relief constitutes a claim only if it is an alternative to a right to payment or if compliance with the equitable order will itself require the payment of money"].  State law generally controls the issue of whether a "right to payment" exists as an available alternative to an equitable remedy.  *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 19 (2000) ["The 'basic federal rule' in bankruptcy is that state law governs the substance of claims, Congress having 'generally left the determination of property rights in the assets of a bankrupt's estate to state law.'"] (*quoting Butner v. United States*, 440 U.S. 48, 54 (1979)); *see also Smith v. H.D. Smith Wholesale Drug Co. (In re McCombs)*, 659 F.3d 503, 508-09 (5th Cir. 2011); *In re Kilpatrick*, 160 B.R. 560, 564 (Bankr. E.D. Mich. 1993) [discussing in detail the interplay of §502(c) and the general bankruptcy rule that state law controls whether a "right to payment" exists].   Accordingly, if state law makes monetary damages available as an alternative to specific performance, then the equitable relief sought constitutes a "claim" dischargeable in bankruptcy.[32]

        Because of the insertion of the choice of law provision into the 2006 Renewal

---

        [32] It is worth noting that the "right to payment" held by the nondebtor does not exist separately and distinctly from the equitable relief sought such that one is discharged while the other remains.  The "right to payment" as contemplated by the definition under § 101(5)(b) is what makes the otherwise non-dischargeable equitable remedy dischargeable. *See Kilpatrick*, 160 B.R. at 567.

-15-

Addendum, Michigan law determines whether an alternative right to payment exists in

this case.  As indicated in *Kilpatrick*, a decision by a federal bankruptcy court sitting in

Michigan applying Michigan law, and as subsequently affirmed by recent Michigan

appellate decisions, monetary damages are clearly available as an alternative remedy

under Michigan law for the compensation for violation of a valid non-compete agreement.

*See, e.g., Grigg Box Co. v. Michigan Box Co.*, 2009 WL 3401111, at *2 (Mich. Ct. App.

2009); *Faargsob, L.L.C. v. HTSTS, L.L.C.,*  2007 WL 2404516, at *1 (Mich. Ct. App.

2007); *Schmitt*, 470 N.W.2d at 409; *Brillhart v. Danneffel*, 194 N.W.2d 63 (Mich. Ct.

App. 1971); *Superior Consultant Co., Inc. v. Walling*, 48 F.3d 1219, 1995 WL 94746, at

*1 (6th Cir. 1995) [remanding case for calculation of money damages for breach of a

non-compete covenant].  Therefore, the breach of a covenant not to compete  would seem

to "give rise to a right of payment" in a bankruptcy scenario since Michigan law

recognizes the payment of money as an available alternative to equitable relief in

enforcement of the covenant.  *See Kilpatrick*, 160 B.R. at 565.

　　　　To the degree to which the Plaintiff can even challenge the viability of money

damages as an available alternative remedy under Michigan law for enforcement of the

covenant, the Plaintiff carries the corresponding burden of proof.  *Kilpatrick*, 160 B.R. at

565 [finding that assigning to the creditor the burden of proving that an obligation is not a

claim (and hence is not subject to discharge) was appropriate in light of the creditor's

burden to prove its case under both state and bankruptcy law]. That is inherently difficult for the Plaintiff to accomplish, given that it has sought a judgment for monetary damages arising from the breach of that covenant not-to-compete not only in this case, but also in the federal court action in Michigan. Looking beyond that inherent difficulty, the Plaintiff has otherwise failed to sustain its burden to demonstrate by a preponderance of the admitted evidence that the monetary damages otherwise available to it under Michigan law are in any way insufficient or inadequate as recompense for its injuries. In fact, though Plaintiff's representative testified regarding the general purpose of covenants not-to-compete in franchise agreements and the importance of enforcing such covenants, and though Plaintiff generically argued that monetary damages might be difficult to calculate or lead to "instability" within the franchise system, the evidence presented by the Plaintiff was far short of that necessary to establish that the obligation that the Plaintiff seeks to enforce, and the deterrent effect it might seek to create through that enforcement, cannot be obtained through an award of monetary damages.[33]  Accordingly, under the relevant authority, the Court concludes that Plaintiff holds a "claim" against the Debtors pursuant to the definition stated in §101(5)(b) that may be discharged in

---

[33] Though Plaintiff's representative referenced both market share and diminution of the value of Plaintiff's proprietary information in her testimony at trial, a distinction exists between the equitable relief sought pursuant to the Debtors' breach of the covenant not to compete and the turnover demands for the proprietary equipment and information (books/manuals/etc.) held by the Debtors. The Franchise Agreement contemplates two separate and distinct obligations, only one of which – the covenant not to compete – is being addressed here.

-17-

bankruptcy because of the availability of monetary damages for breach of a covenant not-to-compete under Michigan law.  As a result, the Plaintiff's request for declaratory relief that it possesses an independent right to segregate and separately employ equitable relief to enforce the covenant not-to-compete against the Debtors must be denied.

*Plaintiff's § 523(a)(6) Claim*

The Plaintiff further seeks a determination that the claim that it holds against the Debtors is non-dischargeable under §523(a)(6) of the Bankruptcy Code as a willful and malicious injury.  Though not addressed by the parties at any time during this proceeding, the Court subsequently noted that the Plaintiff's claim in this case, as well as those of other creditors, are currently being addressed under a confirmed Chapter 13 plan, rather than through a liquidation and ultimate distribution under Chapter 7 of the Bankruptcy Code.  Thus, the dischargeability of the claim asserted by the Plaintiff is not ripe for determination at the present time.

Upon completion of a Chapter 13 plan, a debtor receives what was formerly referred to colloquially as a "super-discharge" that discharges most, but not all, types of pre-petition debts — including many debts that might otherwise have been rendered non-dischargeable in a Chapter 7 case.  *See* 11 U.S.C. §§ 1328(a).  Though down through the years the scope of this so-called "super-discharge" has been narrowed considerably, a debt for a "willful and malicious injury" remains one of those categories of debt that is

-18-

subject to discharge if a debtor completes performance under a confirmed plan in a

Chapter 13 case and is issued a discharge under Chapter 13.  Thus, as long as the Debtor-

Defendants continue to perform the obligations arising under their confirmed Chapter 13

plan, the validity of the Plaintiff's §523(a)(6) claim is simply not ripe for decision.  *In re*

*Young*, 425 B.R. 811, 815 (Bankr. E.D. Tex. 2010) (*quoting Ambassadors Travel Services*

*v. Liescheidt (In re Liescheidt)*, 404 B.R. 499, 505 (Bankr. C.D. Ill. 2009).[34]  This creates

an unusual procedural conundrum.  Therefore, in order to avoid an unnecessary delay as

we await the continued prosecution of the Debtors' Chapter 13 case, the Court finds that

it is appropriate to sever by appropriate order the Plaintiff's §523(a)(6) claim from the

declaratory judgment request as contained in the Plaintiff's complaint.  The Plaintiff's

§523(a)(6) claim will be placed in a new adversary proceeding and further consideration

of its merits shall be abated pending the outcome of the Debtors' Chapter 13 case. The

Court will, however, proceed to issue a final judgment in this adversary proceeding

regarding the Plaintiff's declaratory judgment request.

### Conclusion

Because the covenant not-to-compete sought to be enforced by the Plaintiff,

Allegra Network, LLC, against the Debtor-Defendants, Michael G. and Elnoria J. Ruth,

was void from its inception under applicable Michigan law and because, in any event, the

---

[34]  Of course, the conversion of the Debtors' underlying bankruptcy case to a case under Chapter 7 or any effort by the Debtors to obtain a hardship discharge under §1328(b) [such being the equivalent of a Chapter 7 discharge] would change this scenario.

right of the Plaintiff to enforce that covenant constitutes a "claim" against the Debtor-Defendants, pursuant to 11 U.S.C. §101(5)(b) of the Bankruptcy Code, that is subject to discharge in bankruptcy because of the availability of monetary damages as an appropriate remedy for breach of a covenant not-to-compete under Michigan law, the Court concludes that the Plaintiff's request for declaratory relief, and all related requests, must be denied.  The Plaintiff's cause of action for a determination of the non-dischargeability of its claim against the Debtor-Defendants under 11 U.S.C. §523(a)(6) shall, however, be severed into a new adversary proceeding and consideration of that claim shall be abated pending the outcome of the Debtors' Chapter 13 case.

This memorandum of decision constitutes the Court's findings of fact and conclusions of law[35] pursuant to Fed. R. Civ. P. 52, as incorporated into adversary proceedings in bankruptcy cases by Fed. R. Bankr. P. 7052.  An appropriate judgment, and appropriate orders regarding severance and abatement of the Plaintiff's §523(a)(6) claim shall be entered which are consistent with this opinion.

Signed on 01/10/2013

THE HONORABLE BILL PARKER
UNITED STATES BANKRUPTCY JUDGE

---

[35]  To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such.  To the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such.  The Court reserves the right to make additional findings and conclusions as necessary or as may be requested by any party.

-20-